## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| CLAUDIA L. SALVI and JHON S. OROZCO, | ) ) | Case No. |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | COMPLAINT |
| | ) | |
| NATIONAL CREDIT SYSTEMS, INC. and WOODLANDS OF TALLAHASSEE LLC, | ) ) ) | Jury Trial Demanded |
| | ) | |
| Defendants. | ) | |

### Nature of this Action

1.      Claudia L. Salvi and Jhon S. Orozco (together, "Plaintiffs") bring this action against National Credit Systems, Inc. ("NCS") and Woodlands of Tallahassee LLC ("Woodlands") (together, "Defendants") pursuant to the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and the Florida Consumer Collection Practices Act ("FCCPA"), Fla Stat. § 559.55 *et seq*.

2.      As an initial matter, Congress enacted the FDCPA in order to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e).

3.      To protect consumers and ensure compliance by debt collectors, numerous courts, including those within the Eleventh Circuit, have recognized that the FDCPA is a strict liability statute. *See, e.g.*, *Kaplan v. Assetcare, Inc.*, 88 F. Supp. 2d 1355, 1361 (S.D. Fla. 2000) (Gold, J.).

4.      Strict liability enhances the remedial purpose of the statute, which courts interpret liberally to protect consumers. *See Agrelo v. Affinity Mgmt. Servs., LLC*, 841 F.3d 944, 951 (11th

Cir. 2016) ("[The defendants'] reasoning is contrary to our precedent and inconsistent with the remedial purpose of the FDCPA and FCCPA."); *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703, 707 (11th Cir. 1998) (holding that a consumer protection statute "is remedial in nature and therefore must be construed liberally in order to best serve Congress' intent").

5.     As the Consumer Financial Protection Bureau ("CFPB")—the federal agency tasked with enforcing the FDCPA—explained, "[h]armful debt collection practices remain a significant concern today. In fact, the CFPB receives more consumer complaints about debt collection practices than about any other issue." *See* Brief for the CFPB as Amicus Curiae, ECF No. 14, p. 10, *Hernandez v. Williams, Zinman, & Parham, P.C.*, No. 14-15672 (9th Cir. Aug. 20, 2014), http://www.ftc.gov/system/files/documents/amicus_briefs/hernandez-v.williams-zinman-parham-p.c./140821briefhernandez1.pdf.

6.     In fact, nearly half of the debt collection complaints received by the CFPB involve debt collectors' attempts to collect debts that consumers did not owe. *See* Consumer Financial Protection Bureau, Fair Debt Collection Practices Act—CFPB Annual Report 2020 at 14 (2020), https://files.consumerfinance.gov/f/documents/cfpb_fdcpa_annual-report-congress_03-2020.pdf (last visited December 2, 2020).

7.     To that end, the FDCPA prohibits false or misleading representations, and unfair or unconscionable means, in collecting or attempting to collect a debt. 15 U.S.C. §§ 1692e, 1692f.

8.     Florida's state-law analog—the FCCPA—offers many of the same protections and more. *See* Fla. Stat., § 559.552 ("This part is in addition to the requirements and regulations of the federal act. In the event of any inconsistency between any provision of this part and any provision of the federal act, the provision which is more protective of the consumer or debtor shall prevail.").

9.     Among the FCCPA's prohibitions: claiming or attempting to enforce a debt that is

known not to be legitimate. *Id.*, § 559.72(9).

10.     This case centers on Defendants' multiple attempts to collect an alleged debt that Plaintiffs did not, and do not, owe, even after Plaintiffs specifically informed them so, and despite documents in Defendants' own records confirming that the alleged debt is not valid.

## Jurisdiction and Venue

11.     This Court has subject matter jurisdiction under 15 U.S.C. § 1692k(d), 28 U.S.C. § 1331, and 28 U.S.C. § 1367(a).

12.     Venue is proper before this Court under 28 U.S.C. § 1391(b) as a substantial portion of the acts and transactions giving rise to Plaintiffs' action occurred in this district.

13.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

## Parties

14.     Ms. Salvi is a natural person who at all relevant times resided in Broward County, Florida.

15.     Mr. Orozco is a natural person who at all relevant times maintained a permanent residence in Broward County, Florida and a part-time school residence in Leon County, Florida.

16.     Ms. Salvi and Mr. Orozco are mother and son.

17.     Plaintiffs are "consumers" as defined by 15 U.S.C. § 1692a(3).

18.     Plaintiffs' alleged obligation owed or due, or asserted to be owed or due, arises from a transaction in which the money, property, insurance, or services that are the subject of the transaction were incurred primarily for personal, family, or household purposes—namely, administrative fees allegedly owed to Woodlands for a college apartment (the "Alleged Debt").

19.     NCS is a for-profit corporation with headquarters in Atlanta, Georgia.

20.     NCS touts itself as "a specialized collection firm helping apartment owners and managers recover money that is rightfully owed to them by former residents who have not fulfilled their lease obligations." *See* https://www.nationalcreditsystems.com/Company.aspx (last visited December 2, 2020).

21.     NCS was founded in 1991 and "was designed as, and continues to be operated as, an agency specifically focused on collecting debt for the apartment industry." *Id.*

22.     Over the years NCS "has grown to provide collection services to more apartment owners and managers than any other company in the country. [It is] licensed to collect debts throughout the U.S. and provide a full range of collection services to the multifamily industry." *Id.*

23.     NCS's suite of services includes pre-collect programs on a flat-rate or contingency-fee basis; standard collection services; in-house garnishment of existing judgments; pre-legal services; full legal services; and account purchase options. *Id.*

24.     NCS claims a mantra of "P.R.I.D.E.": Professionalism, Results, Integrity, Determination, and Excellence. *Id.*

25.     According to NCS's website: "P.R.I.D.E. is a statement of our company's commitment to the positive manner in which we provide our services and conduct ourselves in performing our work. We incorporate each of these attributes in our day-to-day business. Whether we are interacting with clients, former residents, employees, vendors, or other parties, we work diligently to uphold these standards." *Id.*

26.     For its clients, NCS boasts "[i]ntegration with your property management software for quick and efficient submission of accounts," plus related "[t]echnologies such as advanced telephony systems, document imaging, customized multifamily-centric software, ACH drafts, full-time call recording, local number caller ID, live call monitoring and coaching." *Id.*

27.     NCS is an entity that at all relevant times was engaged, by use of the mails and telephone, in the business of attempting to collect a "debt" from Plaintiffs, as defined by 15 U.S.C. § 1692a(5).

28.     Upon information and belief, at the time NCS attempted to collect the Alleged Debt from Plaintiffs, the Alleged Debt was in default, or NCS treated the Alleged Debt as if it were in default from the time that NCS acquired it for collection.

29.     NCS uses instrumentalities of interstate commerce or the mails in a business the principal purpose of which is the collection of debts, and/or regularly collects or attempts to collect, directly or indirectly, debts owed or due, or asserted to be owed or due, another.

30.     NCS held itself out to Plaintiffs as a debt collector.

31.     NCS is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

32.     Woodlands is a for-profit limited liability company with principal offices in Cook County, Illinois.

33.     Woodlands operates an apartment rental community in Tallahassee, Florida catering to local college students at Florida State University.

34.     Woodlands is a "creditor" pursuant to Fla Stat. § 559.55(5).

**Factual Allegations**

35.     In 2017, Mr. Orozco signed an apartment rental lease agreement with Woodlands to live in one of its apartment units at Woodlands on West Tennessee[1] for the 2018-19 school year while he attended Florida State University.

36.     Ms. Salvi, his mother, co-signed the lease agreement with Mr. Orozco.

---

[1]     This apartment community has since changed its name to Redpoint West Tenn. *See* https://redpoint-wtenn.com/ (last visited December 2, 2020).

37.     Ms. Salvi co-signed the lease agreement electronically, from her home in Broward County, Florida.

38.     Prior to ever moving into the apartment community, Mr. Orozco ultimately terminated the Woodlands lease agreement, and he found a new resident to take his place.

39.     Woodlands provided Mr. Orozco a letter dated July 16, 2018 confirming termination of his lease agreement.

40.     A true and correct copy of Woodlands' July 16, 2018 letter to Mr. Orozco is attached as Exhibit A.

41.     In that letter, Woodlands confirmed: "Following our approval of a new resident which we have agreed to consider as mitigation for our loss from your termination, we have agreed to the termination. You will not be responsible for any charges under the Housing Agreement." Ex. A.

42.     Despite this confirmation, Woodlands later referred Plaintiffs' account to NCS for collection of an allegedly unpaid administrative fee of $200.

43.     In connection with the collection of this Alleged Debt, NCS sent each of Plaintiffs a letter dated May 29, 2020.[2]

44.     A true and correct copy of NCS's May 29, 2020 letter to Ms. Salvi is attached as Exhibit B, and a true and correct copy of NCS's May 29, 2020 letter to Mr. Orozco is attached as Exhibit C.

45.     Both letters are materially identical in seeking to collect $200 from Plaintiffs allegedly owed to Woodlands. *See* Ex. B; Ex. C.

---

[2]     Plaintiffs understand that NCS claims that it sent additional collection letters earlier than May 29, 2020, but Plaintiffs never received those earlier letters at their home address in Broward County, Florida.

46.     Both letters begin with NCS stating: "We regret that you have failed to make suitable arrangements concerning the above referenced obligation." Ex. B; Ex. C.

47.     NCS then warns, "Be advised, our company has already reported this account to all three national credit bureaus. As reported, this negative listing may likely be affecting your ability to obtain credit, rent, or secure favorable interest rates, perhaps significantly." Ex. B; Ex. C.

48.     But NCS also assures Plaintiffs that "[o]nce paid, our company will update your credit record to reflect this account as satisfied in full." Ex. B; Ex. C.

49.     At the bottom of both letters, NCS states in bold print: "**This communication from a debt collector is an attempt to collect a debt and any information obtained will be used for that purpose.**" Ex. B; Ex. C.

50.     After receiving NCS's May 29, 2020 letters, Plaintiffs placed telephone calls to NCS to dispute the Alleged Debt, and to explain that neither Mr. Orozco nor Ms. Salvi is responsible for any account balance to Woodlands due to Mr. Orozco's 2018 termination of his lease agreement.

51.     NCS nonetheless persisted in its collection efforts.

52.     NCS later sent Plaintiffs additional collection letters dated August 3, 2020 offering to resolve the Alleged Debt in exchange for payment of $100, a supposed "50% Debt Discount Offer."

53.     A true and correct copy of NCS's August 3, 2020 collection letter to Ms. Salvi is attached as Exhibit D, and a true and correct copy of the August 3, 2020 collection letter to Mr. Orozco is attached as Exhibit E.

54.     In its August 3, 2020 letters—both of which are materially identical—NCS proclaims: "We are authorized to extend an offer to you to resolve the above-referenced debt for

50% of the current balance. To accept this offer, remit payment to National Credit Systems, Inc. by 08/31/2020. We are not obligated to renew this offer." Ex. D; Ex. E.

55.     At the bottom of the August 3, 2020 letters, NCS once again states in bold print: "**This communication from a debt collector is an attempt to collect a debt and any information obtained will be used for that purpose.**" Ex. D; Ex. E.

56.     On several occasions before and after NCS's August 3, 2020 letters to Plaintiffs, they explained to NCS's representatives over the telephone that the Alleged Debt is not valid due to Mr. Orozco's termination of the lease agreement in 2018 and Woodlands' acceptance of that termination *with no further payment obligations*. *See* Ex. A.

57.     NCS's representatives nevertheless continued with their collection efforts, telling Plaintiffs that Woodlands either could not, or would not, verify any release of obligations pursuant to Mr. Orozco's 2018 termination.

58.     To that end, on October 1, 2020, NCS sent Ms. Salvi an additional collection letter still showing a balance of $200 owed to Woodlands.

59.     A true and correct copy of NCS's October 1, 2020 collection letter to Ms. Salvi is attached as Exhibit F.

60.     In its October 1, 2020 letter, NCS acknowledges that is "aware of your dispute concerning the above referenced account." Ex. F at 1.

61.     But NCS warns: "Your dispute has been investigated; however, we have yet to find sufficient evidence to validate your claim(s). It is very important that you provide our company with all relevant documentation and information supporting your position." *Id.*

62.     NCS continues, "In the event that new information is obtained which places doubt on the validity of this debt, we will promptly update our records appropriately." *Id.*

63.     NCS also states in the October 1, 2020 letter that Woodlands had validated the Alleged Debt: "It is important to know that National Credit Systems, Inc. is a third party debt collection agency whose efforts are solely on behalf of the current creditor who has previously validated this debt." *Id.*

64.     NCS once again identifies itself as a debt collector in the October 1, 2020 letter. *Id.*

65.     The October 1, 2020 letter concludes: "Enclosed you will find documentation provided to us by Woodlands of Tallahassee LLC." *Id.*

66.     The enclosure is an account statement from Woodlands dated August 11, 2018—more than two years old by that point—purporting to show an outstanding balance of $200 for an "Administrative Fee." *Id.* at 2.

67.     Significantly, this August 11, 2018 account statement *postdates by nearly one month* the July 16, 2018 letter completely absolving Plaintiffs of any obligations under the lease agreement.

68.     More importantly, Plaintiffs eventually learned that NCS held a copy of Woodlands' July 16, 2018 letter *in NCS's own records* during the entirety of its collection efforts, as the letter had been included with Plaintiffs' file when transferred to NCS for collection.

69.     That is, during its months-long collection campaign, NCS already was on notice that Woodlands—the creditor for the Alleged Debt—earlier ha d absolved Plaintiffs of any responsibility under Mr. Orozco's lease agreement, specifically assuring Mr. Orozco: "You will not be responsible for any charges under the Housing Agreement." Ex. A.

70.     On several telephone calls, Plaintiffs argued with Defendant's representatives that the Alleged Debt is illegitimate, explained the lease termination in 2018, and implored Defendant to consult with Woodlands to rectify this problem.

71.     At the same time, Plaintiffs also contacted Woodlands directly on several occasions to dispute the Alleged Debt and to attempt to put an end to this ordeal.

72.     Unfortunately, for months, Plaintiffs' efforts proved fruitless as NCS continued to attempt to collect the Alleged Debt from Plaintiffs, all the while reporting negative marks to the credit bureaus.

73.     Several of Plaintiffs' telephone calls with NCS proved contentious, with at least one of NCS's representatives abruptly hanging up the telephone when ultimately confronted with the July 16, 2018 letter from Woodlands.

74.     Not until October of this year—after several infuriating months of aggravation and frustration for Plaintiffs—did Defendants finally acknowledge the July 16, 2018 Woodlands letter and admit their errors.

75.     First, on October 7, 2020, Woodlands' General Manager sent e-mail confirmation that the Alleged Debt is not, and never was, owed for Plaintiffs' terminated lease.

76.     A true and correct copy of Woodlands' October 7, 2020 e-mail is attached as Exhibit G.

77.     In that email, Woodlands' General Manager acknowledges NCS's collection efforts and states: "I verified that on your Mutual Termination document that no such amount was owed. I've reversed the $200 amount on your account and notified [NCS] to zero out the balance and cease collections efforts." Ex. G.

78.     The General Manager further assures that NCS "report[s] account updates to the credit bureaus each Monday and should do so next Monday." *Id.*

79.     Then, on October 12, 2020, NCS notified Plaintiffs that its client (Woodlands) had canceled the account, so NCS "will no longer pursue the recovery of this account."

80.     A true and correct copy of NCS's October 12, 2020 concession letter to Ms. Salvi is attached as Exhibit H, and a true and correct copy of NCS's October 12, 2020 concession letter to Mr. Orozco is attached as Exhibit I.

81.     NCS once again identifies itself as a debt collector in that correspondence. Ex. H; Ex. I ("This communication from a debt collector is an attempt to collect a debt and any information obtained will be used for this purpose.").

82.     As of the filing of this complaint, Defendants have *not* updated Plaintiffs' credit reports to correct Defendants' reporting errors.

83.     Defendants' negative credit reporting related to the Alleged Debt caused damage to Plaintiffs' credit.

84.     To be sure, earlier this year, Ms. Salvi was denied an HSBC credit card account as a result of the negative marks on her credit report.

85.     Negative marks related to the Alleged Debt also appear on Mr. Orozco's credit report as well.

**Count I: Violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(2)(A)
Against NCS**

86.     Plaintiffs repeat and re-allege each and every factual allegation included in paragraphs 1 through 85.

87.     The FDCPA at 15 U.S.C. § 1692e provides, in pertinent part:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

* * * *

(2) The false representation of—

    (A) the character, amount, or legal status of any debt;

88.     NCS's May 29, August 3, and October 1, 2020 communications to Plaintiffs were sent in connection with an attempt to collect the Alleged Debt from Plaintiffs.

89.     At the time NCS acquired the Alleged Debt for collection, it was, upon information and good faith belief, considered to be in default.

90.     By attempting to collect a sum that Plaintiffs did not owe, however, NCS made false, deceptive, and misleading representations concerning the character, amount, and legal status of the Alleged Debt.

91.     To be sure, neither NCS nor Woodlands is entitled to any monies under the lease agreement terminated by Mr. Orozco, as Woodlands confirmed in July 2018, and as Plaintiffs explained to NCS on multiple occasions, and Plaintiffs do not, and did not, owe any other monies to Woodlands.

92.     Plaintiffs learned from NCS's representatives that, at the time NCS sought to collect the Alleged Debt from Plaintiffs, NCS already was in possession of the July 16, 2018 letter from Woodlands confirming that Mr. Orozco "will not be responsible for any charges under the Housing Agreement." Ex. A.

93.     NCS thus attempted to collect a sum ($200) from Plaintiffs that NCS knew, or should have known, was not owed.

94.     As a result, NCS violated 15 U.S.C. § 1692e(2)(A).

95.     The harm suffered by Plaintiffs is particularized in that the violative debt collection letters at issue were sent to them personally, regarded their personal alleged debt, and falsely, deceptively, and misleadingly tried to collect a debt that Plaintiffs did not owe.

96.     Likewise, NCS's actions created a concrete harm in that they constituted a debt collection practice that Congress specifically prohibited, and they created the risk that Plaintiffs would pay monies they did not owe.

97.     Moreover, NCS's actions caused Plaintiffs aggravation, frustration, and emotional distress in being subjected to NCS's persistent and illegitimate collection efforts—even after Plaintiffs specifically apprised NCS of the Alleged Debt's illegitimacy.

98.     Further, as a result of NCS's negative credit reporting in connection with the Alleged Debt, Ms. Salvi's credit score suffered, she was denied an HSBC credit card, and Mr. Orozco's credit report shows negative marks as well.

**Count II: Violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692f(1)
Against NCS**

99.     Plaintiffs repeat and re-allege each and every factual allegation included in paragraphs 1 through 85.

100.    The FDCPA at 15 U.S.C. § 1692f provides, in pertinent part:

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

101.    NCS's May 29, August 3, and October 1, 2020 communications to Plaintiffs were sent in connection with an attempt to collect the Alleged Debt from Plaintiffs.

102.    At the time NCS acquired the Alleged Debt for collection, it was, upon information and good faith belief, considered to be in default.

103.    By attempting to collect a sum that Plaintiffs did not owe, however, NCS used unfair and unconscionable means to collect or attempt to collect the Alleged Debt.

104.    To be sure, neither NCS nor Woodlands is entitled to any money under the lease agreement that Mr. Orozco terminated in 2018, which Woodlands confirmed by way of letter dated July 16, 2018, and as Plaintiffs explained to NCS on multiple occasions, and Plaintiffs do not, and did not, owe any other monies to Woodlands.

105.    Indeed, at the time it sought to collect the Alleged Debt from Plaintiffs, NCS possessed a copy of the July 16, 2018 letter from Woodland absolving Plaintiffs of any financial responsibility under the terminated lease agreement.

106.    As a result, NCS violated 15 U.S.C. § 1692f(1).

107.    The harm suffered by Plaintiffs is particularized in that the violative debt collection letters at issue were sent to them personally, regarded their personal alleged debt, and unfairly and unconscionably tried to collect a debt that Plaintiffs did not owe.

108.    Likewise, NCS's actions created a concrete harm in that they constituted a debt collection practice that Congress specifically prohibited, and they created the risk that Plaintiffs would pay monies they did not owe.

109.    Moreover, NCS's actions caused Plaintiffs aggravation, frustration, and emotional distress in being subjected to NCS's persistent and illegitimate collection efforts—even after Plaintiffs specifically apprised NCS of the Alleged Debt's illegitimacy.

110.    Further, as a result of NCS's negative credit reporting in connection with the Alleged Debt, Ms. Salvi's credit score suffered, she was denied an HSBC credit card, and Mr. Orozco's credit report shows negative marks as well.

### Count III: Violations of Fla. Stat., § 559.72(9)
### Against Defendants

111.    Plaintiffs repeat and re-allege each and every factual allegation included in paragraphs 1 through 85.

112.    The FCCPA in pertinent part provides:

In collecting consumer debts, no *person* shall:

\* \* \* \*

(9) Claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist.

\* \* \* \*

Fla. Stat., § 559.72(9) (emphasis added).

113.    Given the legislature's use of the word "person," numerous federal and state courts throughout Florida have broadly interpreted the FCCPA's prohibitions as applying to both debt collectors and creditors alike. *See, e.g.*, *Williams v. Educ. Credit Mgmt. Corp.*, 88 F. Supp. 3d 1338, 1343 (M.D. Fla. 2015) ("Notably, ECMC ignores the plain language of § 559.72, which states simply that '*no person shall*' engage in the enumerated debt collection practices. And, more troubling, ECMC also ignores the well-established body of case law which clearly indicates that § 559.72 is not restricted to debt collectors.") (collecting cases).

114.    The May 29, August 3, and October 1, 2020 communications were sent by NCS, on behalf of Woodlands, in connection with an attempt to collect the Alleged Debt from Plaintiffs.

115.    At the time NCS acquired the Alleged Debt for collection from Woodlands, it was, upon information and belief, considered to be in default.

116.    By attempting to collect a sum that Plaintiffs did not owe, however, Defendants claimed, or attempted to enforce, a debt that they knew or should have known was not legitimate.

117.    To be sure, neither NCS nor Woodlands is entitled to any money for an alleged administrative fee that Woodlands specifically disclaimed in July 2018, *see id.*, which Plaintiffs explained to both Defendants during the course of their repeated collection efforts over the span of several months.

118.    Woodlands, by virtue of its status as a creditor within the scope of the FCCPA, is liable for the conduct of NCS—the debt collector it retained to collect money on its behalf. *See Williams*, 88 F. Supp. 3d at 1343; *accord Freeman v. ABC Legal Servs. Inc.*, 827 F. Supp. 2d 1065, 1076 (N.D. Cal. 2011) (when considering two debt collectors accused of violations under the FDCPA, "The rationale behind vicarious liability in this context is that if an entity is a debt collector and hence subject to the FDCPA, it should bear the burden of monitoring the activities of those it enlists to collect debts on its behalf.").

119.    As a result, Defendants violated Fla. Stat., § 559.72(9).

120.    The harm suffered by Plaintiffs is particularized in that the violative debt collection letters at issue were sent to them personally, regarded their personal alleged debt, and wrongly claimed or attempted to enforce a debt that Plaintiffs did not owe, and which therefore was not legitimate.

121.    Likewise, Defendants' actions created a concrete harm in that they constituted a debt collection practice that the Florida legislature specifically prohibited, and they created the risk that Plaintiffs would pay monies they did not owe.

122.    Moreover, Defendants' actions caused Plaintiffs aggravation, frustration, and emotional distress in being subjected to persistent and illegitimate collection efforts—even after Plaintiffs specifically apprised both Defendants of the Alleged Debt's illegitimacy.

123.    Further, as a result of NCS's negative credit reporting in connection with the Alleged Debt, Ms. Salvi's credit score suffered, she was denied an HSBC credit card, and Mr. Orozco's credit report shows negative marks as well.

**Trial by Jury**

124.    Plaintiffs are entitled to, and demand, a trial by jury.

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

a) Adjudging and declaring that NCS violated 15 U.S.C. §§ 1692(e)(2)(A) and 1692f(1);

b) Awarding Plaintiffs actual and statutory damages pursuant to 15 U.S.C. § 1692k;

c) Adjudging and declaring that Defendants violated Fla. Stat., § 559.72(9);

d) Awarding Plaintiffs actual and statutory damages and punitive damages pursuant to Fla. Stat., § 559.77(2);

e) Awarding Plaintiffs their reasonable costs and attorneys' fees incurred in this action, including expert fees, pursuant to 15 U.S.C. § 1692k and Fla. Stat., § 559.77(2);

f) Awarding Plaintiffs any pre-judgment and post-judgment interest as may be allowed under the law; and

g) Awarding such other and further relief as the Court may deem just and proper.


Date: December 3, 2020                    */s/ Jesse S. Johnson*
                                          Jesse S. Johnson
                                          Florida Bar No. 69154
                                          Greenwald Davidson Radbil PLLC
                                          7601 N. Federal Hwy., Suite A-230
                                          Boca Raton, Florida 33487
                                          Tel: (561) 826-5477
                                          jjohnson@gdrlawfirm.com

                                          *Counsel for Plaintiffs*